[Cite as *In re R.D.W.*, 2021-Ohio-4304.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE R.D.W., ET AL.          :

                            :           No. 110661

Minor Children          :

                            :

[Appeal by R.G., Sr., Father]          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 9, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-19-907047, AD-19-907048, and AD-19-907049

---

### *Appearances:*

R. Tadd Pinkston, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant-father, R.G., Sr. ("Father"), appeals the juvenile court's decision terminating his parental rights and granting permanent custody of his minor children to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency"). He raises the following assignments of error for review:

1. The trial court erred in its R.C. 2151.414(B) analysis to the prejudice of Father as there was not clear and convincing evidence to support the court's findings.

2. The trial court erred to the prejudice of Father in terminating his parental rights despite the agency failing to make reasonable efforts at reunification.

3. Father was deprived of his right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section Ten, Article I of the Ohio Constitution.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} Father and A.W. ("Mother") are the biological parents of the minor children, R.G. (d.o.b. 04/15/2009),[1] Ja.W. (d.o.b. 12/12/2016), and R.G.III (d.o.b. 03/05/2019). On June 6, 2019, CCDCFS filed a complaint alleging that R.G.III was an abused and neglected child. The agency further alleged that R.G. and Ja.W. were neglected children. In support of its complaint, the agency asserted the following relevant particulars:

1. A complaint was previously filed which cannot be disposed of within the 90-day time frame. Said case is dismissed as this current complaint is filed.

2. On November 28th, 2017, [Father] was designated as the legal custodian and residential parent of [R.G.] due to lack of stable housing by Mother.

---

[1] Throughout these proceedings, the parties and the court interchangeably referred to their oldest child as R.G. or R.D.W. We refer to this child as R.G. based on the information presented at the permanent custody hearing.

3. [Father] fails to ensure that [R.G.] attends school on a regular basis, and [R.G.] has over 40 days of unexcused absences.

4. [Father] is abusing marijuana while being the primary caregiver of the child [R.G.].

5. On March 5, 2019, Mother and [R.G.III] tested positive for marijuana and cocaine when [R.G.III] was born.

6. Mother has a substance abuse problem related to cocaine and marijuana which prevents her from providing appropriate care for the children. Mother has participated in substance abuse treatment in the past but has not maintained her sobriety.

7. Mother does not have stable housing in which to provide the children. Mother has resided in at least four different residences in the last 18 months.

* * *

10. Alleged father of [R.G.III] and Ja.W., [Father], has failed to establish paternity.[2]

{¶ 4} Following a hearing, the children were committed to the pre-dispositional custody of CCDCFS. In August 2019, the court determined that the allegations of the amended complaint were proven by clear and convincing evidence. Upon agreement of the parties, the matter proceeded to disposition, and the children were committed to the temporary custody of the agency. The court found, in relevant part:

---

[2] With respect to Father, the complaint was subsequently amended to delete the reference to Father's alleged abuse of marijuana. As discussed further below, however, the agency's case plan for reunification required Father to complete a drug and alcohol assessment in order to determine whether Father's use of drugs and alcohol do not "interfere with his ability to meet the child[ren]'s basic or safety needs on a consistent basis."

The court finds that the child[ren]'s continued residence in or return to the home of the mother and the father will be contrary to the child[ren]'s best interests.

The court finds that [CCDCFS] has made reasonable efforts to prevent removal of the child[ren], to eliminate the continued removal of the child[ren] from [their] home, or to make it possible for the child[ren] to return home. Case plan objectives for the mother are substance abuse assessment with recommendations, parenting education. The mother was referred to Hitchcock and The Collaborative. The mother no longer resides with [Father]. The case plan will be amended to include stable housing and basic needs. Case plan objectives for [Father] are substance abuse assessment with recommendations, parenting education and to establish paternity. No referrals have been made because [Father] has refused to cooperate. [Father] signed a case plan today and will be referred to Recovery Resources, The Collaborative, and to establish paternity.

{¶ 5} On February 18, 2020, CCDCFS filed a motion to modify temporary custody to permanent custody. The motion was supported by the affidavit of CCDCFS social worker, Jasmine Lynard ("Lynard"), who averred that Father (1) "has failed to complete a substance abuse assessment and parenting classes"; and (2) "has failed to establish paternity, and has failed to support, visit, or communicate with the children." Lynard further averred that Mother failed to complete her intensive outpatient program for substance abuse and failed to submit mandated urine screens.

{¶ 6} On July 17, 2020, Father filed a motion for legal custody pursuant to R.C. 2151.353(A)(3). Father argued that he "has substantially complied with the directives of [CCDCFS] and is ready and able to have physical care and control of his sons." He noted that he has stable housing, successfully completed a basic parenting

program, and has no impediments "which would preclude [him] from providing a safe and stable home for the children."

{¶ 7} On October 1, 2020, CCDCFS filed a notice of emergency amendment to Father's case plan, informing the court that it was necessary to amend Father's case plan to include services for anger management. The agency expressed that the amendment was in the children's best interest due to Father's "continued aggressive behavior during visits."

{¶ 8} The matter proceeded to a hearing on June 14, 2021. At the hearing, Lynard testified that she was assigned to the children's case in April 2019. She explained the scope of the parents' case plans for reunification, including Father's obligation to establish paternity and complete services for substance abuse, parenting, and anger management. Lynard further discussed the scope of Mother's case plan, but indicated that she did not successfully complete necessary services.[3]

{¶ 9} Regarding Father's case plan, Lynard confirmed that Father had completed a parenting class and established paternity for R.G. However, as of the time of the hearing, Father was only believed to be the alleged father of Ja.W. and R.G.III based on his failure to establish paternity for each child. In addition, Lynard testified that Father did not undergo a substance abuse assessment despite the agency's separate referrals to two drug-treatment facilities. Father also declined to submit urine screens on "over 30" occasions. Finally, Lynard testified that Father

---

[3] Testimony and information relating to Mother is discussed in further detail in Mother's companion appeal, *In re R.D.W.,* 8th Dist. Cuyahoga No. 110662.

did not engage in anger-management services despite two separate referrals to a behavioral-health facility.

{¶ 10} Lynard also provided extensive testimony concerning Mother and Father's relationship with the children and their behavior during visits with the children. In 2019, visitation with the children was set to occur weekly at the neighborhood collaborative. After health restrictions were implemented in March 2020, the agency continued to allow in-person visits with the children. However, after an incident in July 2020, the visits were moved to a more secure location in a CCDCFS facility. Lynard explained that it was necessary to move the location of the visits because "she no longer felt safe" being alone with Mother and Father due to their aggressive and volatile behaviors. Once the visits were relocated to the agency facility, Mother and Father were inconsistent with their visitation between July and September 2020. The children were transported two and a half hours each way for the visits, and Lynard opined that the parents' failure to attend the scheduled visits negatively impacted the children. Ultimately, in-person visits with the children were suspended in September 2020, after the parents again became irate with Lynard in front of the children. Lynard stated that Father began calling her a liar and began yelling profanity at her. While Lynard was attempting to contact security, "another advocate which was shadowing [Lynard] heard [Father] say, [b****] I'll come to your house." This incident prompted the agency to require case plan services for anger management.

{¶ 11} In December 2020, Lynard attempted to arrange virtual visits with the children. However, Mother and Father did not join the scheduled virtual visits, and did not contact the agency regarding the resumption of visits until February 2021. Thereafter, Mother continued to be inconsistent with visitation and participated in "less than five" visits with the children between February and April 2021. Similarly, Father only participated in one virtual visit with the children.

{¶ 12} Lynard testified that the children have been in their current foster home since April 2020. Lynard described the positive bond the children share with their foster family and expressed that "they're a family."

{¶ 13} Based on the foregoing, Lynard opined that it was in the children's best interests to have the agency awarded permanent custody. She expressed that Father did not benefit from his parenting classes based on his failure to consistently demonstrate appropriate behavior in front of the children. Lynard further confirmed that Father was not in a position to be reunified with the children because he did not successfully complete the paternity, substance abuse, and anger management portions of his case plan. Lynard concluded, in relevant part:

> Since the duration of this case a case plan was developed, services were offered to the family and the parents failed to reduce the safety and the risk that the agency initially had and we haven't been provided any other relatives. So permanent custody, that's the next best thing the agency can do.

{¶ 14} Dr. Sheila Ferguson ("Dr. Ferguson") testified that she is employed as a professional clinical counselor at the Catholic Charities Corporation of Cleveland, Ohio. Dr. Ferguson testified that she was present during several of the parents' visits

with the children. Relevant to this appeal, Dr. Ferguson confirmed that Mother and Father often engaged in inappropriate behavior in front of the children. Dr. Ferguson stated that Father was often angry and blamed the agency employees for the circumstances that led to the children's removal from their homes. However, she confirmed that Mother and Father deeply loved their children. Dr. Ferguson stated that "the family always had a great time together."

{¶ 15} At the close of trial, the court heard from the children's guardian ad litem, Melanie GiaMaria, Esq. ("GAL"). Consistent with the written report of the previously appointed guardian ad litem, the GAL recommended that permanent custody be granted in favor of CCDCFS. The GAL indicated that she desired to provide Mother additional time to address her substance abuse issues. However, the GAL expressed that she "[could not] do anything but recommend permanent custody" due to Mother's "history with not completing treatment."

{¶ 16} In separate journal entries, the juvenile court granted the agency's motion for permanent custody. The trial court found, by clear and convincing evidence, that despite the agency's reasonable efforts for reunification, the children could not be placed with either of their parents within a reasonable time or should not be placed with either of their parents and that it is in the best interests of the children to be placed in the permanent custody of CCDCFS.

{¶ 17} Father now appeals from the juvenile court's judgment.

## II. Law and Analysis

### A. Termination of Parental Rights

{¶ 18} In his first assignment of error, Father argues the juvenile court's judgment was not supported by clear and convincing evidence. In his second assignment of error, Father contends the court's judgment was improper because the agency failed to make reasonable efforts at reunification. We address these assigned errors together.

{¶ 19} CCDCFS may obtain permanent custody by first obtaining temporary custody of a child and then filing a motion for permanent custody under R.C. 2151.413. *See In re M.E.*, 8th Dist. Cuyahoga No. 86274, 2006-Ohio-1837. There is no dispute that the proper procedure occurred here. When CCDCFS files a permanent custody motion under R.C. 2151.413 after obtaining temporary custody, the guidelines and procedures set forth under R.C. 2151.414 apply.

> Courts apply a two-pronged test when ruling on permanent custody motions. To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. Second, courts must determine that terminating parental rights and granting permanent custody to the agency is in the best interest of the child or children using the factors in R.C. 2151.414(D).

*In re De.D.*, 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 16.

{¶ 20} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24. "'Clear and convincing evidence' is that quantum of

evidence that instills in the trier of fact a firm belief or conviction as to the allegations sought to be established." *In re T.S.*, 8th Dist. Cuyahoga No. 109957, 2021-Ohio-214, ¶ 23, quoting *In re Y.V.*, 8th Dist. Cuyahoga No. 96061, 2011-Ohio-2409, ¶ 13. If the grant of permanent custody is supported by clear and convincing evidence, we will not reverse that judgment. *In re J.J.*, 8th Dist. Cuyahoga No. 108564, 2019-Ohio-4984, ¶ 30.

{¶ 21} With regard to a challenge based upon manifest weight of the evidence, the Supreme Court of Ohio has explained:

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their [judgment], if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶ 22} When conducting a manifest weight review, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder

of fact." *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461

N.E.2d 1273 (1984).

{¶ 23} Therefore,

> [t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re Satterwhite*, 8th Dist. Cuyahoga No. 77071, 2001-Ohio-4137. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding (i.e., observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. *Id.*, citing *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

*In re C.T.*, 8th Dist. Cuyahoga No. 87159, 2006-Ohio-1944, ¶ 15.

### 1. R.C. 2151.414(B)(1) Factors

{¶ 24} As stated, R.C. 2151.414(B) sets forth a two-pronged analysis the

juvenile court is required to apply when ruling on a motion for permanent custody.

R.C. 2151.414(B)(1) states permanent custody may be granted to a public or private

agency if the juvenile court determines by clear and convincing evidence at a hearing

held pursuant to division (A) of R.C. 2151.414, that it is in the best interest of the

child and any of the following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the

child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 25} In this case, it appears the juvenile court initially relied on R.C. 2151.414(B)(1)(d) in determining that the first prong of the analysis was satisfied because the children have "been in temporary custody of [CCDCFS] which is for twelve (12) or more months of a consecutive twenty-two (22) month period. The [children have] been in the temporary custody since June 6, 2019." It is well settled that R.C. 2151.414(B)(1)(d) "clearly provides parents with 12 months to demonstrate their ability and fitness to care for their child before an agency can move for permanent custody on R.C. 2151.414(B)(1)(d) grounds." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 25. Significantly, however, "the time that passes between the filing of a motion for permanent custody and the permanent-

custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." *Id.* at ¶ 26.  Here, the agency moved for permanent custody on February 18, 2020, less than six months after the children were adjudicated and placed in the agency's temporary custody.  Although the children's custodial history was relevant to the court's best interest considerations under R.C. 2151.414(D)(1)(c), we agree with Father's assertion on appeal that the juvenile court erred to the extent it determined R.C. 2151.414(B)(1)(d) was applicable.  Nevertheless, for the reasons that follow, we find the court's reliance on R.C. 2151.414(B)(1)(d) to be harmless.  *See In re S.C.*, 8th Dist. Cuyahoga No. 108036, 2019-Ohio-3664, ¶ 72.

{¶ 26} In its journal entry and findings of fact, the juvenile court also found, pursuant to R.C. 2151.414(B)(1)(a), that the children could not be placed with Mother or their alleged fathers within a reasonable time or should not be placed with Mother or their alleged fathers.  This finding was consistent with the agency's exclusive reliance on R.C. 2151.414(B)(1)(a) in its motion for permanent custody.

{¶ 27} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E).  *In re A.V.*, 8th Dist. Cuyahoga No. 101391, 2014-Ohio-5348, ¶ 58; *In re R.M.*, 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14; *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 13.  A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent.  *In re*

*Ca.T.*, 8th Dist. Cuyahoga No. 108969, 2020-Ohio-579, ¶ 27, citing *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 42.

{¶ 28} In this case, the juvenile court found, pursuant to R.C. 2151.414(E)(1), that

> [f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

{¶ 29} In addition, the court found, pursuant to R.C. 2151.414(E)(2), that

> [a]lleged father has a chemical dependency that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing in this matter.

{¶ 30} Next, the court found, pursuant to R.C. 2151.414(E)(3), that

> alleged father [has] neglected the child[ren] between the date the original complaint was filed and the date of the filing of this motion by the failure to regularly visit, communicate, and complete case plan services.

{¶ 31} The court also found, pursuant to R.C. 2151.414(E)(4), that

> alleged father [has] demonstrated a lack of commitment towards the child[ren] by failing to regularly support, visit, or communicate with the child[ren] when able to do so, or by other actions [has] shown an unwillingness to provide an adequate permanent home for the child[ren].

{¶ 32} Finally, the court found, pursuant to R.C. 2151.414(E)(16), that there were other relevant factors present in this case, including Father's failure to establish paternity for Ja.W. and R.G.III.

{¶ 33} In challenging the foregoing findings, Father acknowledges his failure to establish paternity. However, he disputes the court's determination that he has a chemical dependency that affects his ability to parent where the evidence demonstrates that he merely self-reported marijuana use. Father further contends that the agency failed to make reasonable efforts towards reunification by failing to make anger-management services readily available to him. Father also suggests the agency failed to adequately investigate potential placement options with relatives.

{¶ 34} To the extent Father disputes the efforts of the agency, we are unpersuaded. The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419. "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3d Dist. Allen No. 1-01-75, 2001 Ohio App. LEXIS 4809, 3 (Oct. 30, 2001). To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.*

{¶ 35} "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. "'Reasonable efforts' does not mean all available efforts." *In re J.B.*, 8th Dist. Cuyahoga No. 109039, 2020-Ohio-3675, ¶ 21, quoting

*In re Lewis*, 4th Dist. Athens No. 03CA12, 2003-Ohio-5262, ¶ 16. "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re K.M.*, 12th Dist. Butler No. CA 2004-02-052, 2004-Ohio-4152, ¶ 23. "'The issue is not whether [the agency] could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.'" *In re S.F.*, 2d Dist. Montgomery No. 25318, 2013-Ohio-508, ¶ 21, quoting *In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096, ¶ 13; *In Re A.F.*, 2018-Ohio-310, 103 N.E.3d 1260, ¶ 65 (2d Dist.); *In re K.W.*, 8th Dist. Cuyahoga No. 106700, 2018-Ohio-3314, ¶ 45 ("Whether an agency * * * made reasonable efforts pursuant to R.C. 2151.419 is based on the circumstances of each case, not whether there was anything more the agency could have done."). "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

{¶ 36} In this case, the record shows that CCDCFS made reasonable efforts to reunite Father with the children by establishing a workable case plan that included services to address concerns with Father's ability to provide a safe and stable environment for the children. Contrary to Father's position on appeal, the record supports the court's determination that CCDCFS worked diligently to facilitate reunification by referring Father to local agencies, including Beech Brook, Recovery Resources, and New Visions. Although Father completed the recommended parenting program, he simply failed to engage with the various substance abuse and anger management referrals made by the agency. Lynard

further testified that the agency investigated several individuals for placement of the children. However, these individuals were either determined to be unsuitable or expressed an unwillingness to take the children into their homes. Thus, although the trial court was not required to make a "reasonable efforts" finding in its permanent custody order, we find the record demonstrates that the agency complied with its statutory obligations under R.C. 2151.419.

{¶ 37} Finally, we conclude that the juvenile court's findings pursuant to R.C. 2151.414(E) were supported by clear and convincing evidence. In reaching this conclusion, this court acknowledges that there is no information in the record to suggest Father's use of marijuana has rendered him an unfit parent. However, Father's failure to undergo a substance abuse assessment pursuant to his case plan prevented the juvenile court from obtaining a comprehensive understanding of Father's drug use and its contribution to the circumstances that caused the children to be placed in the temporary custody of CCDCFS. Lynard also provided extensive testimony concerning Father's failure to establish paternity and the incidents that caused the agency to amend Father's case plan to contain objectives for anger management. In addition, Lynard explained that Father continued to demonstrate a lack of commitment to his children by being inconsistent with visitation despite the agency's facilitation of virtual options for Father to communicate with his children. Collectively, Father's conduct during the pendency of this case established his failure to substantially remedy the conditions that caused the children to be

removed from their home and his unwillingness to provide an adequate, permanent home for the children.

{¶ 38} Accordingly, we find the foregoing evidence supports the trial court's application of R.C. 2151.414(E) and its finding pursuant to R.C. 2151.414(B)(1)(a) that the children could not be returned to Father's custody within a reasonable time or should not be placed with Father.

## 2. R.C. 2151.414(D)(1) Best-Interest Factors

{¶ 39} We review a juvenile court's determination of a child's best interests under R.C. 2151.414(D) for abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 40} In determining the best interests of a child at a hearing held pursuant to R.C. 2151.414(A)(1), the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 41} Although a juvenile court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. We have previously stated that only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000), citing *In re Shaeffer Children*, 85 Ohio App.3d 683, 621 N.E.2d 426 (3d Dist.1993).  Moreover, the Ohio Supreme Court has clarified that

R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e).  Consideration is all the statute requires.

*In re A.M.*, Slip Opinion No. 2020-Ohio-5102, ¶ 31.

{¶ 42} In this case, the court expressed that it considered the relevant factors set forth under R.C. 2151.414(D)(1) when assessing the children's best interests. Based on this record, we do not find that the juvenile court abused its discretion in determining that permanent custody was in the children's best interests.  The testimony presented during the permanent custody hearing established that Father

loves his children and is bonded with each child. However, the court was also provided with extensive testimony regarding Father's inconsistent commitment towards the children, his frequent engagement in inappropriate behavior in front of the children, the children's need for permanency, and the children's positive bond with their current foster family. Moreover, the court was guided by the recommendation of the GAL, who spoke on behalf of the young children and reluctantly recommended that it was in the best interests of each child to grant the agency permanent custody. And, as discussed, the testimony elicited at trial conclusively demonstrated that Father has not fully satisfied the objectives of his case plan and has not proven that he can provide a permanently stable environment for the children. Accordingly, we conclude that the juvenile court's termination of parental rights and award of permanent custody of the children to CCDCFS is supported by clear and convincing evidence in the record.

{¶ 43} Father's first and second assignments of error are overruled.

## B. Ineffective Assistance of Counsel

{¶ 44} In his third assignment of error, Father argues his counsel rendered ineffective assistance of counsel by failing to "object, call witnesses, or file a witness list." Father contends that he was prejudiced by counsel's failure to object to the social worker's hearsay statements concerning the threats Father allegedly made to her during a supervised visit. He further maintains that he was prejudiced by counsel's failure to call witnesses on his behalf.

{¶ 45} "[T]he test for ineffective assistance of counsel used in criminal cases is equally applicable in actions seeking to force the permanent, involuntary termination of parental custody." *In re Heston*, 129 Ohio App.3d 825, 827, 719 N.E.2d 93 (1st Dist.1998), citing *Jones v. Lucas Cty. Children Servs. Bd.,* 46 Ohio App.3d 85, 546 N.E.2d 471 (6th Dist.1988).

{¶ 46} In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of effective assistance, and to show deficiency the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Bradley* at 142. "'Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.'" *In re W.T.*, 2d Dist. Montgomery No. 23427, 2009-Ohio-5409, ¶ 50, quoting *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 47} Initially, Father challenges counsel's failure to object to Lynard's testimony that she was told by another agency employee that Father had called her a derogatory term and threatened to come to her home. Father contends that his

counsel was ineffective for not objecting on the ground that the testimony was inadmissible hearsay.

{¶ 48} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." Evid.R. 801(C). It has been recognized that

> hearsay is not admissible in adversarial juvenile court proceedings at which a parent, charged with neglecting his or her children, may lose the right to custody of his or her children. * * * [Because] the judge acts as the factfinder and is presumed to be able to disregard hearsay statements, the person against whom the hearsay statements were admitted in such a case must show that the statements were prejudicial or were relied upon by the judge in making his [or her] decision.

*In re Lucas*, 29 Ohio App.3d 165, 172, 504 N.E.2d 472 (3d Dist.1985), quoting *In re Vickers Children*, 14 Ohio App.3d 201, 206, 470 N.E.2d 438 (12th Dist.1983), and citing *In re Sims*, 13 Ohio App.3d 37, 468 N.E.2d 111 (12th Dist.1983).

{¶ 49} In this case, there is no information in the record to suggest Father's alleged statement weighed heavily in the court's decision to award permanent custody in favor of CCDCFS. As discussed, the juvenile court's judgment centered on Father's failure to comply with his case-plan objectives and his failure to consistently visit and communicate with his children. Although the court also relied on Lynard's testimony concerning Father's repeated use of inappropriate behavior in front of the children, the challenged statement was only introduced in an attempt to explain why Father's case plan was amended to include services for anger management. Because the court heard testimony describing Father's continuously volatile behavior during the agency's involvement with the children, we find

Lynard's testimony concerning this specific incident, while relevant to explaining the actions of the agency, did not substantially contribute to the court's judgment. Thus, regardless of whether or not the out-of-court statement was inadmissible hearsay, the testimony was harmless and counsel was not ineffective for failing to raise an objection.

{¶ 50} We are equally unpersuaded by Father's position that counsel was ineffective for failing to call witnesses to testify "despite [his] referrals to the agency of family members willing to take the children." At trial, Lynard testified that she investigated several interested parties during the course of these proceedings. Ultimately, however, the interested parties were inappropriate or expressed that they were unwilling to take custody of the children. On cross-examination, Lynard acknowledged that Father identified his daughter and his own mother as potential custodians. She explained, however, that Father later expressed that his mother was unwilling to take the children. Thus, no formal investigation into paternal grandmother's suitability occurred. On this record, it is speculative to conclude that there were any suitable relatives that were both willing to take the children and willing to testify on Father's behalf. Accordingly, we are unable to conclude that counsel rendered ineffective assistance of counsel by failing to call members of Father's family to testify at the hearing.

{¶ 51} Briefly, we note that the record does, in fact, reflect that counsel attempted to present the testimony of Father's brother at the close of the agency's case-in-chief. Counsel explained that the witness was not disclosed because Father

provided information about the witness after the court's discovery deadline had passed. CCDCFS objected to the presentation of a witness because it had no notice of the witness prior to the hearing. After careful consideration, the court declined to allow Father's brother to testify on his behalf. Viewing the record in its entirely, it is unclear what information Father's brother intended to provide at the permanent custody hearing. The record is silent on the brother's involvement in the agency's case or his relationship with the children. Moreover, the transcript demonstrates that the court's denial of counsel's request to present testimony from Father's brother was not the product of counsel's neglect, but was caused by Father's own untimely disclosures to counsel. Under these circumstances, we decline to find ineffective assistance of counsel.

{¶ 52} Father's third assignment of error is overruled.

{¶ 53} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, J., CONCURS;
EILEEN A. GALLAGHER, P.J., CONCURS IN JUDGMENT ONLY